Filed 5/13/24  Wiedner v. Stevenson CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| PATTY WIEDNER, | B323760 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. 19STPB11853 |
| v. | |
| CHARLYNE STEVENSON, as Trustee, etc., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Ana Maria Luna, Judge.  Affirmed in part, reversed in part, and remanded.

John A. Bunnett for Defendant and Appellant.

John Alan Cohan for Plaintiff and Respondent.

_____

Before her death, Roberta Louise Davis established a special needs trust—within her own inter vivos trust—to benefit her gravely disabled adult son Daniel L. Black during his lifetime. Daniel was under a Lanterman-Petris-Short (LPS) conservatorship. One of Roberta's sisters, appellant Charlyne Stevenson, was the successor trustee of Roberta's trust, trustee of Daniel's special needs trust, and a contingent, remainder beneficiary of Roberta's trust upon Daniel's death. Another sister, respondent Patty Wiedner, was excluded from the trust. She became involved in Daniel's care after Roberta's death in June 2016 and, in April 2019, succeeded the public guardian as Daniel's conservator.[1] At the heart of this appeal is a dispute between these sisters over payments Patty asked Charlyne to make to her from the trust. In the end, the probate court ordered Charlyne pay Patty from the trust: her conservator fees, costs she had advanced and incurred for Daniel's benefit, and her court-appointed attorney's fees and costs.

Charlyne appeals from that order, and the court's order awarding $1,750 in sanctions against Charlyne and her counsel after it denied Charlyne's motions for new trial and to set aside the judgment. Charlyne asserts several errors. She contends Patty had no standing or legal basis to demand her conservator fees and attorney fees be paid from the trust; substantial evidence did not support the expenses, fees, and attorney fees the court ordered to be paid; the sanctions were not justified

---

[1] We refer to Roberta, Daniel, Charlyne, and Patty by their first names for ease of reference. We intend no disrespect in doing so.

or authorized by law; and irregularity in the proceedings and the exclusion of relevant evidence resulted in a miscarriage of justice requiring a new trial.

We conclude Patty had standing. We also conclude the terms of the special needs trust allowed reimbursement for some, but not all, of the expenditures Patty claimed and for her conservator fees, and substantial evidence supported the court's findings as to those expenditures. We reverse the court's order in part, however, to the extent it orders Patty be reimbursed for certain expenditures she incurred before her conservator appointment and for her attorney fees. We also reverse the court's sanctions award. We find no miscarriage of justice occurred.

## FACTS AND PROCEDURAL HISTORY

1. ***The trust and conservatorship***

Roberta created her living trust in September 2002. She amended and restated it in March 2010, naming her sister Charlyne as the successor trustee. The main asset of the trust was a single-family residence. Roberta died on June 30, 2016. As successor trustee, Charlyne sold the property, which netted $335,847 to the trust on August 29, 2016.

Roberta's trust included—as a sub-trust—a "special needs trust"[2] for the benefit of her adult son Daniel, who had

---

[2] A special needs trust is a trust that is intended to allow the beneficiary to continue to maintain eligibility for certain needs-based government benefits. (*Balian v. Balian* (2009) 179 Cal.App.4th 1505, 1512.) Daniel's needs-based government benefits were his monthly supplemental security income (SSI) and Medi-Cal benefits.

schizophrenia and developmental disabilities. The sub-trust was known as the "Daniel L. Black Special Needs Trust" (SNT). Charlyne is also the trustee for the SNT.

Around April 2009, before Roberta died, Daniel was placed under an LPS conservatorship.[3] His schizophrenia "made him 'clinically unstable' such that he was in and out of hospitals when he was not housed in a facility." He had behavioral problems, such as "hitting himself, punching walls, disrobing in public, impulsivity and outbursts." The public defender represented Daniel in the LPS conservatorship proceedings. The mental health court appointed the public guardian (Ernest Baiden) as the conservator of Daniel's person and estate.[4]

Daniel received monthly social security and SSI; this constituted his "estate." From these funds, the public guardian paid for Daniel's clothing, room and board, and extra spending money (known as PNI) for personal items, "like soda and other treats." The public guardian paid Daniel's board and care facility about $1,050 a month and deposited $130 a month in PNI to

---

[3] The LPS Act (Welf. & Inst. Code, § 5000 et seq.) provides for the appointment of a conservator of the person, the estate, or both, "for a person who is gravely disabled as a result of a mental health disorder or impairment by chronic alcoholism." (*Id.*, § 5350.)

[4] Baiden was a deputy public conservator with the office of the public guardian. The public guardian must serve as conservator of any person found to be gravely disabled under the LPS Act for whom the court has recommended a conservatorship "if the court finds that no other person or entity is willing and able to serve as conservator." (Welf. & Inst. Code, § 5354.5.)

Daniel's account with the facility (or $35 a month if he were in a skilled nursing facility).  The public guardian also was responsible for making payments for Daniel's medical and dental care.

Daniel's conservatorship was renewed each year until his death in 2020.  (See Welf. & Inst. Code, § 5361, subds. (a) & (b) [an LPS conservatorship automatically terminates one year after the appointment of the conservator unless the conservator, after determining the conservatorship is still required, petitions for reappointment for a succeeding one-year period].)  The public guardian served as Daniel's conservator until April 2019 when Patty succeeded Baiden.

According to Roberta's trust, on her death, the remaining trust property was to be held in the SNT "to provide a supplemental and emergency fund to supplement any public benefits available to [Daniel] during his lifetime."  On Daniel's death, the trustee (Charlyne) was to distribute any remaining trust property "outright" to herself, her daughter (Roberta's niece), and Roberta's great nephew (presumably, the niece's son).

Under the terms of the SNT,

> "No part of the income or principal of the trust shall be used to replace or supplant public benefits of any county or any state, federal, or other governmental agency that has a legal responsibility to serve persons with disabilities or conditions that are the same as or similar to those of [Daniel].  For purposes of determining [Daniel's] eligibility for public benefits, no part of the principal or undistributed income of the trust estate shall be considered available

5

to him, and he shall have no right to compel the trustee to release principal or income to him or for his benefit or otherwise have any access to any of the trust assets."[5]

The SNT also directs that, if the trustee were asked to release trust funds to or on behalf of Daniel to pay for needs that public benefits "would be authorized to provide" in the absence of the SNT,

"the trustee shall deny the request and take whatever administrative or judicial steps may be necessary to continue the eligibility of [Daniel] for all available public benefits, including obtaining a determination or declaration from a court of competent jurisdiction that the trust principal is not available to [Daniel] for purposes of determining his eligibility for any public benefits. Any expenses of the trustee in this regard, including reasonable attorneys' fees, shall be a proper charge to the trust estate."

The SNT mandates that, during Daniel's lifetime, "the trustee shall pay to or apply for the benefit of [Daniel] as much of the net income and as much of the principal of the trust as the trustee, in the trustee's sole discretion, from time to time deems necessary or advisable for the satisfaction of his special needs,"

___

[5] The SNT defines "public benefits" as including, but not limited to, SSI, Medi-Cal or other state medical assistance program authorized under Medicaid, and federal social security disability insurance.

6

meaning, "the requisites for maintaining the good health, comfort, safety, and welfare of [Daniel] when, in the discretion of the trustee, those requisites are not being provided for" by any public benefit program or person legally obligated to support Daniel. The SNT requires the trustee to "consult with any guardian, conservator, custodian, or other person who cares for [Daniel] regarding his special needs."

### 2. *Patty's involvement and appointment as conservator*

Patty, also Daniel's aunt, was not a named beneficiary or successor trustee of Roberta's trust. Patty had not visited Daniel in the seven years before Roberta's death, except maybe once in 2012 or 2013. After Roberta's death in June 2016, Patty began to visit Daniel regularly. She made various expenditures on his behalf, including paying for haircuts, sundries, and clothes; taking him to lunch; and depositing cash in his "account" with the facility where he lived to pay for extra treats. In January 2017, Patty asked John Bunnett, as the trustee's counsel, to reimburse her from the SNT for the money she had spent from July to December 2016. Bunnett refused. He told Patty's then-counsel that Patty was not authorized to make expenditures, or perform duties, on behalf of the SNT, and the listed expenses "were never communicated to or authorized by" Charlyne, as trustee.

At some point, Daniel developed extensive problems with his teeth. He had difficulty eating and pain, which he complained about to Patty. She began taking him to dental providers in December 2016. She obtained estimates for different treatment plans from various providers. In January 2017, a specialist at UCLA provided a $25,925 estimate for extractions, bone grafts, and dental implants. Patty apparently appeared

7

before the mental health court in January 2017 to ask about getting Daniel's teeth fixed. In July, she wrote the judge in the LPS conservatorship proceeding to ask about having Daniel's teeth fixed, and included the estimate.[6]

There was a difference of opinion as to the best course of treatment for Daniel. In her July 2017 letter, Patty wrote she did not believe Daniel was a "good candidate" for partial dentures, as he likely would lose or break them. Baiden, on the other hand, wrote in a January 2018 memorandum, "Any attempt to have all of Mr. Black's teeth extracted for dental implants will be too invasive and not serve Conservatee's best interest."

In August 2017, Baiden responded to the mental health court's inquiry as to whether a family member could be appointed as successor conservator for Daniel. He did not recommend Patty. Baiden described Charlyne and Patty as having an "intense sibling-rivalry." He was concerned Daniel "could possibly become a 'pawn' between his two Aunts." He noted Charlyne's appointment as Roberta's successor trustee "ha[d] bothered" Patty "a lot," and stated Patty was "doing everything possible to even have [*sic*] an invasive procedure to have [Daniel] go through an unnecessary and invasive dental procedure so the Trust will be drained." He believed Daniel's interests would best be served by the public guardian continuing as his conservator.

---

[6] In April 2017, Patty apparently filed a petition in the Riverside County superior court asking it to monitor the SNT. After Charlyne (through Bunnett) filed a demurrer based on Patty's lack of standing, Patty withdrew her petition. Patty's petition is not part of the appellate record.

8

In January 2018, Baiden provided an update on recommendations he had received about Daniel's dental needs. Lumina Dental had identified 14 of Daniel's teeth that should be extracted and recommended upper and lower partial dentures.[7] Baiden also noted Daniel was "clinically unstable, going in and out of hospitals" due to behavioral problems. He "need[ed] to remain in a locked setting at th[at] time due to his ongoing behavioral problems."

In November 2018, Patty asked the public guardian to reimburse her for clothing and other items she had bought for Daniel. Baiden made clear, as he had told her previously, that "[a]ny purchases made for Danny by anyone, without prior authorization from [the] [p]ublic [g]uardian cannot be reimbursed," as the public guardian had to make those purchases directly. Baiden asked Patty to let him know if Daniel told her about specific items he needed.

On April 10, 2019—on Daniel's motion—the mental health court relieved the public guardian as conservator and appointed Patty as Daniel's LPS conservator of the person. Because Patty did not have an attorney, the court appointed one for her (Kelli Stanford). The court noted, "If there are needs that Mr. Black has—that need to be paid out of the special need[s] trust, I would expect that you would make a request for that.

---

[7]      Lumina Dental, however, prepared an estimate that focused on removing only the four worst teeth. The public guardian paid for that treatment in advance—about $3,600— from Daniel's monthly benefits. Daniel was unable to have the procedure at that time due to his instability. By the time he was able, the public guardian no longer was conservator.

9

But if you're making extravagant request[s], then I'm going to be looking at the conservatorship."

On December 6, 2019, the mental health court relieved Stanford as Patty's counsel. The court appointed John Cohan to represent Patty, as Daniel's conservator, "for all purposes" under section 5370.1 of the Welfare and Institutions Code and ordered "[a]ttorney fees to be paid by Los Angeles County."

**3.**     ***Dispute over dental treatment leading to petitions***

In November 2019, Patty obtained estimates from Western Dental, but they did not involve implants. Patty wanted Daniel to have implants. Charlyne and attorney Bunnett did not believe Daniel would handle the procedure well, partly because it required anesthesia and he had apnea. In December 2019, Patty, through attorney Cohan, sent a demand that the SNT pay for proposed dental implant treatment, at first estimated to cost $21,850 and then increased to $50,465. Patty sought an order in the LPS conservatorship case authorizing her, as Daniel's conservator, to consent to dental treatment on his behalf. The court entered an order on January 8, 2020, authorizing Patty to consent on Daniel's behalf to dental implants or dentures, tooth extractions, bone grafts, other procedures, and anesthesia "as needed for the procedures."

Meanwhile, on December 20, 2019, Charlyne, as trustee, filed a petition under Probate Code[8] section 17200 et seq., amended on February 25, 2020, to bring the internal affairs of Roberta's trust and the SNT under the probate court's

---

[8]     Statutory references are to the Probate Code, unless otherwise stated.

10

jurisdiction.[9]  The petition sought, among other things, an order that she had "sole discretion to determine what expenditures" to make from the SNT and to deny expenditures she deemed inappropriate; a determination of the dental treatment Daniel required; instructions as to whether she had discretion to deny spending the requested funds on the dental treatment if she determined it was not in Daniel's best interest; and an order that she was not required to reimburse Patty for any expenses she "purportedly made on behalf of Daniel" that Charlyne did not authorize in advance.  The petition made various factual allegations, including that Patty was trying to drain the trust because she felt "spurned that she had been cut out of" the trust, and essentially had prevented Charlyne from seeing Daniel.

Patty filed a response with objections to Charlyne's amended petition, raising issues of Charlyne's breach of her trustee and fiduciary duties, alleging ethical violations by her counsel, and asking for sanctions and damages.  Patty alleged Daniel was in poor health, "exacerbated by long-standing and serious dental problems" that Charlyne had failed to pay for from the SNT.  Patty alleged Charlyne had refused to pay for anything Daniel "need[ed] or . . . requested" and had "abrogated her duties by delegating day-to-day trust[ ] administration and decision-making" to Bunnett.  Patty asked the court to order Charlyne to pay for Daniel's dental procedures out of the SNT.  The response also included a letter from prosthodontist

---

[9]     Patty filed a notice of related case, which Charlyne opposed.  Because the LPS conservatorship case and the new probate case both fell within the probate division rules, Department 1 did not relate them.

11

Dr. Alfredo Paredes, who saw Daniel in May 2020. He recommended a full mouth reconstruction with dental implants under general anesthesia. The estimated cost was $65,000.

At a hearing on Charlyne's petition on July 31, 2020, after Dr. Paredes testified about Daniel's teeth and that he was suffering from infection that could not be managed long-term with antibiotics, the court ordered Charlyne to release $30,000 from the SNT to Patty by August 10, 2020, to begin Daniel's dental work. The court understood Daniel's treatment "would have to proceed in phases, including multiple stages to extract teeth and then place [the] implants, and that Daniel would have to be sedated with anesthesia." The court directed Patty to submit receipts for the use of the $30,000 to Bunnett, and appointed a guardian ad litem (GAL) for Daniel.

Bunnett filed an ex parte application asking the court to reconsider and/or stay its order directing Charlyne to release the funds to Patty. He argued the health department recently had expanded Medi-Cal dental benefits to include most of the treatment outlined by Paredes.[10] He contended the terms of the trust thus prevented Charlyne from releasing the funds to pay for the covered treatment. Patty opposed the application. Cohan declared he had contacted several Medi-Cal dental offices: they either did not provide the treatment Daniel needed or said they never had been able to get Medi-Cal to pay for dental implants. The court denied the application.

---

[10] The Medi-Cal Dental Provider Handbook required pre-authorization for dental implants and documentation of "exceptional medical circumstances."

Sadly, on August 27, 2020, Daniel had his first dental procedure with Dr. Paredes and died.

On September 30, 2020, Charlyne filed her first and final account and report of trustee seeking reimbursement of costs, for her trustee's and her attorney's compensation, and for distribution of the trust estate. Ultimately, Charlyne sought $15,345.41 in trustee fees at $40 per hour; reimbursement of $1,284.47 in out-of-pocket expenditures for Daniel; and attorney fees for Bunnett totaling $47,318.15. Charlyne does not challenge the court's final order concerning these fees and costs.

On October 8, 2020, the court convened a hearing on Charlyne's first amended petition. The court assumed jurisdiction over Roberta's trust and the SNT and confirmed Charlyne as acting trustee of the trusts. The court ordered "that all proceedings involving the Trust and all proceedings arising under . . . § 17200, et seq. be commenced in the Los Angeles Superior Court, Central District." The court denied Charlyne's other requests or found them moot. The court also gave "an OK to set any petition that should be considered in conjunction with the [trustee's] accounting for 2/18/2021."[11] The petition was to be filed and served by December 15, 2020.

In accordance with the court's order, on December 10, 2020, Patty filed a petition for the allowance of conservator's fees, reimbursement of costs advanced, and payment of costs incurred,

_____

[11]     At the hearing, the court stated that, if Patty planned to seek reimbursement for any expenses, "that should be something that is brought before the court."

13

and allowance of conservator's attorney's fees and costs, all to be paid from the SNT.  Patty and Cohan asserted standing to bring the petition under sections 2640, 2641, and 2642.  The petition alleged there was no conservatorship estate.

Patty asked for reimbursement of out-of-pocket costs totaling $33,228.36 that she made for Daniel's benefit from July 2016 through July 25, 2020; $56,500 for transportation costs from July 2016 to July 15, 2020; and $8,000 in conservator fees as compensation for performing her duties as conservator under section 2641.  Cohan asked for attorney fees from August 5, 2020 to the present.  At $250 per hour they totaled $20,350, but had increased to $38,007.26 by the end of trial.  He also asked for $1,082.26 in costs.

On May 3, 2021, the court set an evidentiary hearing for October 20, 2021, on the petition for conservator's fees and on the trustee's accounting.  The minute order notes that all counsel/parties appeared by LACourtConnect.

The court heard testimony over three days on October 20, 2021, November 3, 2021, and January 31, 2022.  Patty, her husband, Charlyne, Baiden, and Cohan testified.  Bunnett requested a statement of decision.  The court filed its proposed statement of decision on April 25, 2022.  The court established equitable liens against the trust assets for reimbursement of monies to Patty and her conservatorship fees, and as to attorney fees payable to Cohan (and to Daniel's GAL).  The court ordered Patty be reimbursed from the trust $32,198.36 in out-of-pocket expenses, $56,500 in transportation costs, and $8,000 in conservatorship fees; and Cohan be reimbursed $28,947.26 in attorney fees and costs.  As to Charlyne's accounting, the court ordered her to pay from the trust $30,155.65 in attorney fees and

14

$1,231.32 in costs to Bunnett, pay herself $5,760 in trustee fees, reimburse herself $1,284.47 in out-of-pocket costs, and pay the GAL $11,141.88.

Charlyne objected to the proposed statement of decision. The court overruled the objections on May 25, 2022, declared its statement of decision final, and entered its order on Patty's petition on June 24, 2022 and on Charlyne's accounting on July 1, 2022.

On July 15, 2022, Charlyne filed notices of intention to move for a new trial and to set aside the judgment and enter a different judgment under section 663 of the Code of Civil Procedure. She argued the court abused its discretion in not conducting the trial in open court and excluding evidence relevant to her case, and awarded excessive "damages." Charlyne argued the judgment should be set aside because it was based on an error of law, namely, that no legal basis existed to compel the SNT to reimburse Patty for the expenses she claimed or to pay her conservator or attorney fees. She also argued the trial evidence was insufficient to support the court's order.

The court denied the motions on September 2, 2022. On Cohan's request for sanctions in his joint opposition to the motions, the court also ordered Charlyne and Bunnett to pay, jointly and severally, sanctions of $1,750.

Charlyne appealed from the "judgment" on Patty's petition for conservator fees, reimbursement of costs, and attorney fees; from the "judgment" on trustee's first and final account—but only to the extent it ordered Charlyne, as trustee, to pay the amounts granted in Patty's petition; from the court's orders denying Charlyne's motions for new trial and to vacate the judgment

15

and enter a new judgment; and from the court's order imposing sanctions.

## DISCUSSION

Charlyne contends: (1) the probate court abused its discretion in directing Charlyne, as trustee, to pay from the trust Patty's conservator fees and costs allegedly expended for Daniel's benefit and her attorney fees allegedly incurred for Daniel's or the trust's benefit;[12] (2) irregularity in the proceedings and the court's exclusion of evidence resulted in a miscarriage of justice requiring a new trial; (3) substantial evidence does not support the court's awards on Patty's petition, in any event; and (4) the court abused its discretion in imposing $1,750 in sanctions against Charlyne and Bunnett.

### 1. *Standards of review*

As this appeal primarily is from a judgment based on a statement of decision after a bench trial, "we review the trial court's conclusions of law de novo and its findings of fact for substantial evidence." (*McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257.) We resolve " 'any conflict in the evidence or reasonable inferences to be drawn from the facts . . . in support of the determination of the trial court['s] decision.' " (*Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.) "We may not reweigh the evidence and are bound by the trial court's credibility determinations." (*Id.* at p. 76.)

---

[12] More specifically, Charlyne contends the court erred in "imposing an equitable lien against the vested interest of the [trust's] contingent beneficiaries in contravention to the express intentions of the settlor of [Roberta's trust]."

16

Where the trial court's orders are based on the exercise of its discretion—such as the award of conservator fees, expenses, and attorney fees here—we apply the abuse of discretion standard of review. (See, e.g., *Conservatorship of Levitt* (2001) 93 Cal.App.4th 544, 549 [determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court]; § 2640, subd. (c) [court determines if compensation requested by conservator is "just and reasonable"]; cf. *In re Fraysher's Estate* (1956) 47 Cal.2d 131, 136 ["In passing upon the reasonableness and necessity of expenditures during [estate] administration, the court below is vested 'with a broad discretion,' which will not be disturbed on appeal except when abused."].) A court abuses its discretion if it exceeded the bounds of reason or contravened the uncontradicted evidence, failed to follow proper procedure in reaching its decision, or applied the wrong legal standard to the determination. (*Dunlap v. Mayer* (2021) 63 Cal.App.5th 419, 424.)

To the extent the court's orders depend on its interpretation of statutes or of the trust instruments at issue, however, our review is de novo. (*Pena v. Dey* (2019) 39 Cal.App.5th 546, 551, disapproved on other grounds by *Haggerty v. Thornton* (2024) 15 Cal.5th 729 [de novo standard of review applies to questions of statutory interpretation and to interpretation of trust instrument where interpretation does not depend on extrinsic evidence]; see also *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213 [on review of an award of attorney fees after trial, normal standard of review is abuse of discretion; however, de novo review of such a trial court order is warranted where the determination of whether the criteria for

17

an award of attorney fees and costs have been satisfied amounts to statutory construction and a question of law].)

We review the propriety of the trial court's ruling, not its reasoning, and "may uphold the ruling 'on any basis presented by the record whether or not relied upon by the trial court.' " (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 481, fn. 5.)

## 2. *Standing*

Charlyne, as she did below, first contends Patty lacked standing to bring her petition because Patty was neither a trustee nor a beneficiary of the trust. "The probate court has general power and duty to supervise the administration of trusts." (*Schwartz v. Labow* (2008) 164 Cal.App.4th 417, 427 (*Schwartz*).) Section 17200 authorizes a trustee or beneficiary to petition the probate court "concerning the internal affairs of the trust," including to "[s]ettle the accounts and pass[ ] upon the acts of the trustee, including the exercise of discretionary powers." (§ 17200, subds. (a), (b)(5); *Schwartz,* at p. 427 ["[p]roceedings in the probate court 'concerning the internal affairs of the trust' are commenced with the filing of a petition"].) Under section 17206, the probate court "in its discretion may make any orders and take any other action necessary or proper to dispose of the matters presented by the petition."

Here, Charlyne's section 17200 petition raised the issue of her discretionary powers under the trust to decide when to expend SNT funds for Daniel's needs. She specifically asked the court for an order that she was "not required to reimburse Patty . . . for any of the expenses purportedly made on behalf of Daniel . . . not authorized by the Trustee beforehand, and if Patty . . . wishes to duplicate or supplement efforts of the Trustee

18

in providing for the needs of Daniel . . . , such expenses are of her own choosing and not reimbursable by the [SNT]." She also asked the court to order "any and all matters concerning the internal affairs of the trust be brought in the Probate Department of the Los Angeles Superior Court." The court so ordered after assuming jurisdiction over the trusts.

Whether Charlyne abused her discretion as trustee of the SNT in denying reimbursement of expenditures made on Daniel's behalf concerned the propriety of "the acts of the trustee" and was "a matter presented by the petition." Having raised the issue in her own petition, Charlyne cannot now claim Patty had no standing to ask the court—as part of the action Charlyne commenced—for reimbursement from the SNT of her expenses incurred for Daniel's benefit.

Relatedly, Charlyne contends the court had no authority to issue an equitable lien against the trust because the trust assets vested in the remainder beneficiaries on Daniel's death. The court's broad powers under section 17200 enabled the court to consider the acts of the trustee, including the propriety of the trustee having withheld her discretion to release trust funds for Daniel's benefit—despite his untimely death. Having found the trustee was in breach of trust, we conclude the court could impose an equitable lien to remedy that breach in light of the unique circumstances before it. (See *Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 453 [equitable liens may arise out of general considerations of right and justice as applied to the relations of the parties and the circumstances of their dealings; they frequently are based on the equitable maxim that "equity will deem as done that which ought to be done"].) "To preserve [a] trust and to respond to perceived breaches of trust, the

19

probate court has wide, express powers to 'make any orders and take any other action necessary or proper to dispose of the matters presented' by [a] section 17200 petition." (*Schwartz, supra*, 164 Cal.App.4th at p. 427.)

Moreover, Charlyne also filed a first and final account and report of trustee, asking the court to disburse trust funds to Charlyne and her attorney, and distribute the balance of the trust estate to the three remaining beneficiaries. Charlyne's request to settle her account—which arose from the filing of her section 17200 petition—"activated the probate court's duty and authority to scrutinize the appellant's account." (*Schwartz, supra*, 164 Cal.App.4th at p. 427 ["Presented with a section 17200 petition to settle an account, 'the probate court has a duty *imposed by law* to inquire into the prudence of the trustee's administration.' "].) The court could not do so without also considering any claims for reimbursement raised by Patty. The court had the " '*inherent power* to decide all incidental issues necessary to carry out its express powers to supervise the administration of the trust.' " (*Ibid.*) In any event, the court specifically told Patty—if she planned to seek reimbursement for any expenses—"that should be something that is brought before the court." The court's minute order indicated it had given "an OK to set any petition that should be considered in conjunction with the [trustee's] accounting for 2/18/2021."

Finally, we agree with Patty that, as Daniel's conservator,[13] she had standing to bring her petition under sections 2641 and

---

[13] Charlyne contends Patty did not file her petition in her capacity as Daniel's conservator. By the time Patty filed her petition, Daniel's conservatorship had terminated due to his

2642. As we discuss in detail below, those sections expressly authorize a conservator and her attorney to petition the court for conservator and attorney fees. (Whether those sections authorized the court to direct the trust to pay conservator fees and appointed counsel's fees versus whether the court could hear Patty's petition at all is a different question that we address below.) And, as the court noted in denying Charlyne's motion to set aside the judgment, section 2623 authorizes a conservator to seek "[t]he amount of the reasonable expenses incurred in the exercise of the powers and the performance of the duties of the

death. (§ 1860, subd. (a).) Section 2630 allows the court to retain jurisdiction of the conservatorship proceeding in the event of the conservatee's death for the purpose of settling the accounts of the conservator "or for any other purpose incident to the enforcement of the judgments and orders of the court." As Charlyne notes, the probate court did not have jurisdiction over the conservatorship case; the mental health court did. Nevertheless, as Patty would have been able to file her petition as Daniel's conservator had he not died, she did not lose standing to ask the probate court for reimbursement from the trust in connection with Charlyne's petition that brought the trust under the court's jurisdiction. Again, Patty's request relates to the court's consideration of Charlyne's exercise of her discretionary powers and her accounting as trustee. Moreover, the first paragraph of Patty's petition states she was appointed conservator of the person of Daniel, the "deceased beneficiary of the [SNT] subject to this proceeding," and Cohan identifies himself as the "court-appointed counsel for Patty Wiedner, Conservator of Daniel Lee Black, Conservatee." Accordingly, Patty was bringing her petition in her capacity as Daniel's conservator up until his death.

21

. . . conservator." (§ 2623, subd. (a)(1).)  Accordingly, we conclude Patty had standing to file her petition.

3. ***The SNT was not part of Daniel's "estate"***

Patty brought her petition for conservator fees, reimbursement of expenses, and attorney fees under sections 2640,[14] 2641, and 2642.  Section 2641 allows a conservator of the person to petition the court (in a conservatorship proceeding) for "an order fixing and allowing compensation for services in the best interest of the . . . conservatee rendered to that time." (§ 2641, subd. (a).)  "The compensation allowed shall thereupon be charged against the estate." (*Id.*, subd. (b).)  Section 2642, in turn, permits an attorney who has rendered legal services to a conservator to petition the court for "an order fixing and allowing compensation" for those legal services.  (§ 2642, subd. (a).)  Again, any compensation allowed "shall . . . be charged against the estate." (*Id.*, subd. (b).)  Finally, section 2646 provides:  "In proceedings under this chapter [governing compensation of guardian, conservator, and attorney], the court shall only determine fees that are payable from the estate of the . . . conservatee and not limit fees payable from other sources."

Patty had argued—as she does on appeal—that the SNT was part of the conservatee's (Daniel's) estate and thus reachable to pay her conservator and attorney fees under these statutes. Charlyne contended—as she does on appeal—the SNT was not part of the conservatee's estate and thus there was no authority

---

[14]    Section 2640 governs petitions to the court by conservators of the *estate* for an "order fixing and allowing compensation." (§ 2640, subd. (a).)  Patty was appointed conservator of the person only.

22

to direct the trust to pay Patty's conservator and attorney fees. We agree with Charlyne that the SNT is not part of Daniel's "estate."

Patty relies on both section 2586 and 2400.  Section 2586 states, the " 'estate plan of the conservatee' includes, but is not limited to, . . . any trust of which the conservatee is the settlor or beneficiary."  (§ 2586, subd. (a).)  But sections 2641, 2642, and 2646 refer to the conservatee's "estate," not "estate plan." Thus, section 2586 is not relevant to our analysis.  Section 2400 defines " '[e]state' " as "all of the conservatee's personal property, wherever located, and real property located in this state." (§ 2400, subd. (b).)  Section 2640.1, which also is inapplicable to the situation before us, provides, "[i]f a conservator of the estate is not appointed, but a conservator of the person is appointed, the compensation and costs allowed [to the individual who was not appointed conservator] shall be ordered by the court to be paid from property belonging to the conservatee, whether held outright, in trust, or otherwise." (§ 2640.1, subd.(c).)

Patty argues the SNT was part of Daniel's estate because, "[a]t the time [it] was established, Daniel acquired a *vested* property interest in the trust, to be disbursed according to criteria set forth in the instrument."  She cites *Anderson v. Superior Court* (1983) 142 Cal.App.3d 112 (*Anderson*) for the proposition that, " 'the beneficiaries [of a trust] are the real owners of the property.' "  (Quoting, *id.* at p. 117, alteration in respondent's brief.)

The trust in *Anderson* was nothing like the trust here. The trust there was created to sell real property and distribute the proceeds of the sale to the beneficiaries.  The trustee had no other power over the property.  (*Anderson*, *supra*, 142 Cal.App.3d

at p. 116.)  The quotation that Patty altered from the case stated: "Thus, the trust is a naked, dry trust, and the beneficiaries are the real owners of the property." (*Id*. at p. 117.)  Although that may have been the case in *Anderson,* that is not the case with respect to a third-party special needs trust like the one at issue here.

Daniel was not the owner of any of the assets in the SNT. He was the beneficiary of what is known as a "third-party" special needs trust.  A third-party special needs trust—in contrast to a "first-party" special needs trust—"is established by one person (usually a parent) using his or her own funds for the benefit of another, the person with a disability.  It does not involve any assets of the person with a disability." (See Fay Blix, *The World of Special Needs Trusts* (Nov. 2008) 50 Orange County Lawyer 10, *11 (Blix); see also Hook & Kefalas Dudek, Special Needs Trust Handbook (Dec. 2023) § 5.01[B] (Hook) [a third-party special needs trust preserves "public benefits for the trust beneficiary while supplementing the beneficiary's lifestyle with private funds" and "protect[s] the private third-party funds from the state"].)

"The purpose of a special needs trust is 'to enhance the beneficiary's quality of life through the purchase of additional goods and services that are not covered or adequately provided by SSI . . . and Medicaid.' " (*Gonzalez v. City National Bank* (2019) 36 Cal.App.5th 734, 743–744 (*Gonzalez*).)

On Daniel's death, any funds remaining in the SNT would go to the named remainder beneficiaries.  More importantly, although the purpose of the SNT was "to supplement any public benefits available to [Daniel] during his lifetime," he had "no right to compel the trustee to release principal or income to him

24

or for his benefit or otherwise to have any access to any of the trust assets." Accordingly, the trust funds were not available to him and thus not part of his estate.

A first-party or self-settled special needs trust, on the other hand, is funded by the disabled person's *own* assets. (Blix, *supra*, at \*11.) Those assets are not considered in determining the beneficiary's eligibility for needs-based benefits like SSI and Medi-Cal. (*Ibid*.) After the beneficiary dies, however, the government provider of the benefits, such as Medi-Cal, is entitled to reimbursement from any funds left in the first-party special needs trust. (See *Gonzalez, supra*, 36 Cal.App.5th at p. 744 ["so long as the state will recover for the Medicaid services provided to the special needs trust beneficiary during her lifetime, the beneficiary remains eligible for such services, even if the amount in the trust otherwise would disqualify the beneficiary from receiving such benefits"]; *id*. at p. 745 ["California regulations also provide that for a qualifying special needs trust to be considered 'not available' when determining Medi-Cal eligibility, the trust must be set up so that '[t]he State receives all remaining funds in the trust, or respective portion of the trust, upon the death of the individual . . . up to an amount equal to the total medical assistance paid on behalf of that individual by the Medi-Cal program' "]; 42 U.S.C. § 1396p(d)(4)(A) [trust containing assets of a disabled individual under age 65 established for the individual's benefit is not considered in determining individual's eligibility for state Medicaid benefits if the state "will receive all amounts remaining in the trust upon the death of such individual up to an amount equal to the total" benefits paid].)

A third-party special needs trust, however—because it is not funded by the *beneficiary's* assets—need not include such a "payback provision." (Loring & Rounds, A Trustee's Handbook— Rounds and Rounds (2024) § 9.3, p. 1482 & fn. 25; Special Needs Alliance, Administering a Special Needs Trust: A Handbook for Trustees (2024) p. 5 <https://www.specialneedsalliance.org/wp-content/uploads/2024/01/SNA-2024-Handbook.pdf> [as of May 10, 2024], archived at <https://perma.cc/3GVZ-EWUL> (Handbook) [self-settled special needs trusts, unlike third-party trusts, "must include a provision directing the trustee, if the trust contains any funds upon the death of the beneficiary, to pay back anything the state Medicaid program has paid for the beneficiary"]; *id.* at p. 6 [third-party special needs trust is established by someone other than the person with disabilities "with assets that never belonged to the beneficiary" and are not required to include a " 'payback' provision for Medicaid benefits upon the beneficiary's death"].)

The California cases on which Patty relies to argue the SNT was part of Daniel's estate do not involve third-party special needs trusts. Rather, in all of them, the trusts were funded with assets belonging to the settlor.

In *Riverside County Public Guardian v. Snukst* (2022) 73 Cal.App.5th 753, the reviewing court found assets of the revocable inter vivos trust of a deceased settlor, who also was a conservatee and Medi-Cal recipient, constituted his estate for purpose of Medi-Cal reimbursement. (*Id.* at pp. 756–757.) Thus, the trial court should have reimbursed the state from the trust for the Medi-Cal benefits it had provided to the conservatee/settlor during his lifetime before distributing the assets to the trust's beneficiary. (*Ibid.*) Similarly, in *Belshé v. Hope* (1995) 33 Cal.App.4th 161, 163–165, 175, the court held

real property a Medi-Cal recipient had passed to beneficiaries to her inter vivos trust on her death was part of the benefit recipient's estate—despite its transfer—from which the state could seek reimbursement of Medi-Cal benefits it had provided her. Under this reasoning, perhaps if Patty had been Roberta's conservator, Roberta's estate would have included the assets in the trust that were to be distributed to the remainder beneficiaries. *Belshé* thus reinforces Charlyne's point that the assets in the SNT were part of Roberta's—not Daniel's—estate.

Finally, Patty cites *Gonzalez, supra*, 36 Cal.App.5th 734, for its statement, " '[u]pon the death of the beneficiary of a special needs trust, any remaining assets in the trust are treated as part of the beneficiary's estate.' " (*Id.* at p. 751, quoting *Shewry v. Arnold* (2004) 125 Cal.App.4th 186, 197.) Patty, however, omits the important qualifier: " '*for purposes* of Medi-Cal reimbursement.' " (*Gonzalez*, at p. 751, italics added, quoting *Shewry*, at p. 197.) Moreover, the court in *Gonzalez* was describing *Shewry's* discussion of section 3605, which "applies only to a special needs trust established under Section 3604." (§ 3605, subd. (a).) Section 3604 governs the establishment of a special needs trust when the court has ordered that "money of a minor or person with a disability be paid to a special needs trust"—in other words, a first-party trust. (§ 3604, subd. (a)(1).)

In *Gonzalez*, the plaintiffs' daughter was severely disabled due to complications during her birth. After the daughter received a multi-million-dollar settlement in a medical malpractice lawsuit, a court placed the settlement proceeds in a special needs trust with the daughter as the beneficiary. (*Gonzalez, supra*, 36 Cal.App.5th at pp. 739–740.) On the

27

daughter's death, her parents argued the remainder of the trust should be distributed to them.  The court, however, found the state was entitled to reimbursement for the Medi-Cal benefits it had provided the daughter from the funds remaining in the trust after her death.  (*Id.* at pp. 739, 741–742.)  The trust included the required " 'payback' provision" that—under the applicable federal statute—on termination of the trust, the residual shall be payable to any state or state agency that has provided state medical benefits to the beneficiary.  (*Id.* at p. 763.)

Again, unlike the assets used to fund the SNT here, assets placed in a special needs trust established under section 3604 *belong* to the beneficiary.  Those assets—e.g., funds from an injury settlement—otherwise would have been paid directly to the beneficiary.  Thus, absent the creation of the special needs trust in *Gonzalez*, the assets would have been considered in determining the daughter's eligibility for public benefits and she likely would have lost those benefits.  Roberta, however, placed her *own* assets—not Daniel's assets—in the SNT created for him.  Nor is there any similar "payback" provision in the SNT, nor was one required.

As Charlyne notes, the Law Revision Commission Comments to section 3605 state, "On the death of the special needs trust beneficiary or on termination of the trust, trust property may become subject to reimbursement claims under federal or state law.  [Citations.]  For this purpose and only this purpose, the trust property is treated as the beneficiary's property or as property of the beneficiary's estate."  Logically, if trust property belonging to the beneficiary of a special needs trust is treated as the beneficiary's estate only for purposes of

government benefits reimbursement, then property placed in Daniel's SNT, which never was his to begin with, and cannot be reached for reimbursement of benefits paid to him on his death, cannot constitute his estate for purposes of reimbursing conservator fees and attorney fees under the Probate Code.

Accordingly, we do not agree that the conservatee's estate included the SNT—which was funded entirely by Roberta's property, not monies or property owned by Daniel.[15]

4. ***Nevertheless, the terms of the trust allowed reimbursement for some of the expenditures Patty made on behalf of Daniel and for her conservator fees***

Although we cannot construe the SNT as Daniel's *estate*, the probate court's order directing the trustee to reimburse Patty from the trust for her expenditures and costs incurred on Daniel's behalf was based on the terms of the SNT itself. "The primary duty of a court in construing a trust is to give effect to the settlor's intentions." (*Barefoot v. Jennings* (2020) 8 Cal.5th 822,

---

[15] In its order denying Charlyne's motion to set aside the judgment, the court found section 2640.1 provided that "the conservatorship fees and attorney's fees may be paid from the Living Trust as the Probate Code broadly defines 'estate' as a conservatee's 'personal property, wherever located, and real property located in this state.'" (Quoting § 2400.) It's unclear why the court relied on section 2640.1. That section authorizes a person who petitioned for appointment as conservator, but who was not appointed in lieu of a different conservator, to petition the court for compensation for "his or her services rendered in connection with and to facilitate the appointment of a conservator, and costs incurred in connection therewith." (§ 2640.1, subds. (a) & (c).)

29

826.)  Here, the settlor (Roberta) stated her intention clearly. As the court noted, the terms of the trust "clearly show[ed] that the primary use" of the trust's assets—the proceeds from the sale of Roberta's house—"was to provide a supplemental and emergency fund for Daniel" during his lifetime to augment any public benefits available to him.

Under the express terms of the trust, the trustee (Charlyne) was to use the trust income and principal to satisfy Daniel's "special needs"—the "requisites" for maintaining his "good health, comfort, safety, and welfare"—as the trustee in her "sole discretion . . . deem[ed] necessary or advisable."  The terms of the SNT expressly stated Daniel's special needs "shall include, but not be limited to" his medical and dental care, travel needs, and recreation—among other delineated items—to the extent not provided for or reimbursed by public benefits.  Thus, in the court's view, "In a perfect world, Daniel would have lived a much longer life and died spending the last penny of the trust doing something that brought him joy."  As the trial court put it, the terms of the SNT "allow[ed] for payment of those 'extras' for Daniel that public benefits did not cover."[16]  We agree with the trial court's assessment of the trust instrument.

---

[16]    Indeed, an SNT can make disbursements for many services and items not covered by public benefits without affecting the beneficiary's eligibility for Medicaid and SSI—the need-based public benefits Daniel received—such as:  entertainment; recreation; vacations; caregiving; cell phone, cable, or internet services; electronics; clothing; hair care; hobby supplies; magazine and newspaper subscriptions; nonfood grocery items; over the counter medications; and many others.  (See Cal. CEB, Special Needs Trusts: Planning, Drafting, and Administration

The court found, "Patty clearly expended monies to afford Daniel a better quality of life both before and after being appointed as his conservator for which reimbursement is now properly claimed." Except for a few categories of expenses that we discuss below, we agree.

Patty prepared a summary of her expenditures she had made for Daniel—both before and after she was appointed his conservator—and gave the court receipts for some, but not all, of them. They included items for Daniel's direct benefit, such as clothing (including underwear), toiletries, dental care, a radio and batteries, grooming services, entertainment, and meals out—

(2023) §14.67.5 [list of "generally permissible distributions"] (CEB, Special Needs Trusts). Disbursements for food and shelter, however, are considered income that could reduce the amount of SSI the beneficiary receives. (Social Security Administration, Program Operations Manual System—Supplemental Security Income (May 2024) SI 01120.200.E.1.b. <https://secure.ssa.gov/apps10/poms.nsf/lnx/0501120200> [as of May 10, 2024], archived at <https://perma.cc/ME6Q-GECJ> (SSA POMS) ["[f]ood or shelter received by the trust beneficiary as a result of disbursements from the trust to a third party is income in the form of in-kind support and maintenance"]; Hook, *supra*, § 9.01[D][2] ["[a]ll distributions should be made to third parties on behalf of the beneficiary and should be limited, to the extent possible, to items that cannot be considered food or shelter, or converted to use for food or shelter," which are considered income, citing SSA POMS, *supra*, SI 01120.200.E.1.a & 01120.200.E.1.b]; see also Handbook, *supra*, pp. 10–12 [similar].) The occasional meal out "may be characterized as entertainment" rather than food, however. (CEB, Special Needs Trusts, *supra*, § 14.53.)

items and services that no public benefit program provided for Daniel, would not affect Daniel's eligibility for benefits, and were for Daniel's "good health," "comfort," or "welfare," in accordance with the trust's terms.

Patty also testified about her contact with Daniel and the expenditures she made on his behalf, which the court accurately summarized in its statement of decision. The court noted Patty was concerned Daniel "would end up in a psychiatric hospital." Patty thus maintained regular contact with him after his mother died—after a several year lapse in contact—"so that Daniel had some quality of life that kept him happy and less agitated." She put money on Daniel's account at his facility for extra treats, like "snacks and beverages." The court also noted Patty testified she maintained a journal of the expenses she incurred between July 2016 and July 2020, and had receipts for most of her expenses. And, before the evidentiary hearing, the court noted it had "looked through" the summary of Patty's out-of-pocket costs, as well as the receipts. The court thus had evaluated the documentary evidence supporting the expenses Patty claimed she had incurred on Daniel's behalf, as well as Patty's testimony, to determine Patty legitimately incurred them and they were expended to satisfy Daniel's special needs. Those records and Patty's testimony provide sufficient evidence to support the court's finding that Patty's claimed out-of-pocket expenditures (or, at least, most of them) were appropriate expenditures under the terms of the trust.

Nevertheless, the trust terms gave Charlyne the *sole discretion* to determine what was "necessary or advisable" to pay from the SNT for Daniel's needs. Daniel himself had no right to compel Charlyne to release funds, nor did he have any access

to the trust assets. In exercising her sole discretion as trustee, however, Charlyne was required to "act in accordance with fiduciary principles" and could not "act in bad faith or in disregard of the purposes of the trust." (§ 16081, subd. (a); see also Rest.3d Trusts, § 50, subd. (1) ["A discretionary power conferred upon the trustee to determine the benefits of a trust beneficiary is subject to judicial control only to prevent misinterpretation or abuse of the discretion by the trustee."]; *Estate of Giraldin* (2012) 55 Cal.4th 1058, 1072 ["California courts have considered the Restatement of Trusts in interpreting California trust law."].) To determine whether evidence is sufficient to support a trial court's finding that the trustee has "been guilty of an abuse of discretion requires an inquiry into the intentions of the settlor . . . , and an examination of the conduct of the trustee[ ] in the administration of the trust." (*In re Ferrall's Estate* (1953) 41 Cal.2d 166, 174.) We conclude substantial evidence supports the court's finding that Charlyne abused her discretion in declining to reimburse (or objecting after Daniel's death to reimbursement of) Patty's expenditures for Daniel's benefit—that were permissible disbursements under the trust—by disregarding the purpose of the SNT.[17]

---

[17] In considering what amount of trustee fees to award Charlyne, the court also found she "breached her duties as trustee not only as described in the trust document itself but also within the meaning of [§] 16004," which deals with conflicts of interest. The court found "Charlyne had a very high duty to make sure that her decision making and actions did not result in deprivation of trust assets for Daniel's use which would necessarily result in a larger amount being distributed to her upon his death."

33

Charlyne testified Patty shouldn't be reimbursed "[for] a thing" she purchased because Charlyne—or the public guardian when he was the conservator—already had provided Daniel with the same things. Essentially, Charlyne's position was that Patty was making unnecessary, duplicative expenditures without prior authorization.

In her declaration filed in support of her accounting and request for trustee fees, Charlyne averred that, as part of her trustee duties, she had provided Daniel with necessary clothing, cable T.V. to watch sports, money for activities, and whatever else he needed that could be funded from the trust without jeopardizing the public benefits he received. Charlyne's summary of disbursements from the SNT for Daniel's benefit from September 2016 to July 2020 shows payments for Daniel's cable and cellular service, clothing and supplies, shoes, medical care, and "Cash for Daniel Black" (presumably paid to his housing facility for the activities and other needs Charlyne mentioned in her declaration).

From Patty's receipts, it appears she did buy Daniel several apparently duplicative clothing items at times. The court, however, credited Patty's testimony, finding it "credible, thoughtful and unflappable even on cross-examination." The court specifically noted Patty's testimony that she bought extra clothing for Daniel, as he "complained about items going missing in the facility." Patty also testified about having to buy Daniel a new radio because he had broken the two Charlyne had bought. Thus, we can infer the court rejected Charlyne's position that paying for these duplicate items Patty provided was wasteful or unnecessary.

Substantial evidence also supports the court's finding that Charlyne failed to fulfill her duty under Article 5.4(e) of the trust to "consult with any guardian, conservator, custodian, or other person who cares for [Daniel] regarding his special needs"; and under Article 5.4(b) to "regularly consult with [Daniel] and any persons or entities providing care or assistance to [him] for the purpose of determining [his] needs and resources." As the court noted in its statement of decision, Charlyne admitted she did not confer with or reach out to Patty—even after she was appointed conservator—about "any of Daniel's needs."

Rather, Charlyne testified she "just reached out to the board and care homes" where Daniel lived. She had Patty contact Bunnett.[18] The reason, according to Charlyne, was Patty called her at all hours of the night, leading Charlyne to change her phone number.[19] As a result, Charlyne gave Daniel the number to her cell phone but, because no voicemail had been

[18] The court also reasonably could find Charlyne's delegation to Bunnett was not effective. Patty's former court-appointed attorney Stanford told the court, at the July 31, 2020 hearing, that she had written to Bunnett in July 2019 about arranging for any court-approved dental treatment for Daniel and to establish a budget out of the SNT for Daniel's recreational and entertainment needs. Bunnett apparently responded with a letter "that was basically a treatise on special needs trusts, and from that point," he never responded to Stanford's emails or voicemails.

[19] When the court directly asked Charlyne, "Why didn't you reach out to your sister as was your responsibility as trustee?" Charlyne replied, "Because Danny kept telling me she didn't like him."

35

set up on that phone, he could not leave her a message. Charlyne testified that, if she saw she had missed a call from Daniel, she would call him back.

The court thus could find that Charlyne, having failed to consult Patty regularly about Daniel's needs, at least when she was conservator—and arguably beforehand as a "person[ ] . . . providing care or assistance to [Daniel]"—could not reasonably have refused to exercise her discretion to make payments from the SNT to satisfy those needs, as she could not have known what those needs were without consulting Patty. Charlyne apparently did not know Daniel required replacement clothing or other items despite having conferred with his housing facilities. And, Patty testified Daniel could not reach Charlyne by phone. We can infer the court credited this testimony. The court thus could have concluded Charlyne was not regularly asking Daniel about his needs, either.

Accordingly, except for a few categories of costs we discuss below, we conclude the trial court did not err in ordering Patty be reimbursed from the trust for her out-of-pocket expenditures made on Daniel's behalf.

a. *Out-of-pocket attorney fees*

As part of her out-of-pocket costs, Patty asked for reimbursement of attorney fees (and costs) she incurred in 2016 and 2017 with Raxter Law, apparently in connection with or related to the petition she filed in Riverside County that she voluntarily dismissed due to her lack of standing. The record does not demonstrate that Patty's filing of the dismissed petition benefited Daniel in any way. Similarly, she asked for reimbursement of attorney fees incurred in 2017 with Conover & Grebe relating to proceedings in the LPS conservatorship

including a hearing on the appointment of the conservator in September 2017. The record does not demonstrate how these attorney fees Patty incurred benefited Daniel either. Accordingly, the court erred in directing the trustee to reimburse Patty from the trust for those out-of-pocket attorney fees.

  b.  *Cash deposits made before and after appointment as conservator*

Patty's request for reimbursement also included relatively small cash deposits she made on Daniel's account at his housing facility for his "snacks and beverages." Technically, a disbursement from the SNT for Daniel's food could affect his receipt of SSI, as food received by a beneficiary as a result of a disbursement made to a third party is "income in the form of in-kind support and maintenance." (SSA POMS, *supra*, SI 01120.200.E.1.b.)[20] But Charlyne reimbursed herself from the SNT for cash deposits she had made on Daniel's account for his entertainment and other needs. We thus can infer the court found it would be an abuse of Charlyne's discretion not to reimburse Patty as well for those same sorts of expenditures given they were for Daniel's comfort.

On the other hand, Bunnett asked Patty about an ATM withdrawal she had made on November 4, 2019, while she

_____

[20] Similarly, Patty asked for reimbursement for food she purchased for Daniel at grocery stores, such as cereal or juice. We can infer the court concluded either these extra treats were more along the lines of entertainment than food—as Daniel's housing facility provided his food—or the value of any snacks or beverages purchased would have been too small to make a real difference in Daniel's receipt of SSI had he lived.

37

was Daniel's conservator, for $136 that she claimed for reimbursement. Patty testified she had taken that money out of her personal bank account and put it on Daniel's account at his residential care facility for his PNI money.

Patty testified that, "a few times," Daniel's monthly public benefit payments—his social security and SSI—came to her and she put the funds "in the checking account." Patty testified about these funds as Baiden had—that Daniel's monthly social security went to pay for his care at his facility, and his monthly SSI— at either $35 or $136 a month, depending on the type of facility— was put on Daniel's account as his PNI money to pay for "sodas or chips from vending machines or whatever." There was no money left over after making those payments.

As Daniel's monthly SSI either was going to Patty or directly to his facility, there would be no need for Patty to be reimbursed for the $136 she paid for Daniel's PNI. To the extent Patty, as Daniel's conservator, was the named recipient of his SSI, any SSI payments she received, but did not pay to Daniel's account, should be credited back to the trust.

c.      *Mileage and transportation costs*

Patty's summary of expenditures for her out-of-pocket costs also included mileage expenses for driving to visit Daniel. Patty's claimed $56,500 in transportation costs—which the court awarded her—represented the cost attributed to the time Patty's husband took to drive Patty to visit Daniel or take Daniel to appointments. Patty's mileage and transportation costs included trips she made to visit Daniel before and after she became his conservator.

Patty's husband Earl drove her because she did not drive long distances. For a time, Patty did not live close to Daniel's

facilities. According to her records, which the court credited, she drove 110 to 168 miles roundtrip to see Daniel. Earl testified it was five hours roundtrip from their residence in Lake Elsinore to the locations of Daniel's residence and health appointments, which until fall 2019, were in places like Sylmar, Santa Monica, Downey, and Los Angeles. Earl "charged" $400 per roundtrip to these places.[21] He based that figure on the $400 Charlyne paid a third party, who also cut Daniel's hair, to drive her to visit Daniel. She paid her daughter $300 to drive her. (Charlyne was about 79 years old.) Earl testified he also helped Patty with Daniel during her visits—for example, supervising him in public restrooms. Baiden agreed it was necessary to have more than one person transport Daniel anywhere due to his behavior. The court found Patty's husband's and Baiden's testimony credible.

As Daniel's conservator, Patty had a duty to visit him and attend to and assess his needs. Had Daniel had an estate, she would have been entitled to recover "reasonable expenses incurred in the exercise of the powers and the performance of the duties of . . . conservator." (§ 2623, subd. (a)(1).) This evidence supports the trial court's finding that Patty's transportation costs—once she became Daniel's conservator—were reasonable.[22]

---

[21] Patty did not actually pay her husband for driving her.

[22] As she does on appeal, Charlyne argued "travel and mileage by a conservator is generally not reimbursable" under rule 4.43 of the Los Angeles Superior Court Local Rules. That rule does not allow a personal representative to claim "[l]ocal travel and mileage" as costs, but does allow claimed costs for long distance travel. (Rule 4.43(a)(5) & (b)(3).)

39

Moreover, Patty's performance of her duties as conservator were for Daniel's direct benefit. Because she had to drive a long distance to see Daniel, and could not transport him in the car alone,[23] she could not have performed those duties without Earl's services. Accordingly, the court reasonably could find it would be an abuse of discretion for the trustee not to reimburse Patty for these expenses incurred in the course of performing her conservator duties for Daniel.[24]

Before she was appointed Daniel's conservator, however, Patty—and her husband—sat in the position of an aunt and uncle visiting their disabled nephew. And, unlike the items Patty purchased for Daniel or entertainment she provided for him, Patty's mileage and transportation costs did not *directly* benefit

---

[23]    Patty testified she had to sit in the backseat with Daniel to prevent him from bolting from the car.

[24]    Nevertheless, the record does not support requiring the SNT to pay Patty her requested "auto allowance" (mileage) at $.55 per mile for trips where she also claimed transportation fees for Earl's driving "services." Earl testified he and Patty thought a $400 flat rate was reasonable as Charlyne paid that amount for Michelle Higgens (a "beauty operator") to drive her. (Earl "charged" $100 after Daniel moved to a facility in their own county.) Charlyne did not also reimburse herself—or her drivers—for separate mileage fees, however. As Earl based his fees for driving Patty on what Charlyne had paid, his $400 (and $100) trip rates also presumably accounted for mileage. At oral argument, Cohan could not say what the fees included. Accordingly, any mileage expenses Patty claimed during her tenure as conservator for trips where she also claimed a transportation fee should be excluded as duplicative.

Daniel.  We thus cannot conclude Charlyne can be deemed to have abused her discretion by not reimbursing, or objecting to reimbursing, Patty for her mileage or transportation costs in making those voluntary, though thoughtful, visits.  Paying for Patty's mileage and husband-driver was not necessary to Daniel's comfort or welfare, as was—say—buying him clothing to replace what had "gone missing."  Thus, the court had no basis to order the trust to pay for those expenses.

d.    *Other pre-conservator personal expenses*

We also do not agree the SNT required Charlyne to reimburse Patty for her other personal expenses—such as her own (and Earl's) meals and entertainment costs—incurred during visits to Daniel before Patty became his conservator.  Patty was Daniel's aunt.  We cannot conclude Daniel's mother intended the SNT to be used to pay for her sister's meals and entertainment simply because she incurred those costs while visiting her nephew.  (*In re Greenleaf's Estate* (1951) 101 Cal.App.2d 658, 661–662 ["the basic inquiry, whenever the exercise of a trustee's discretion, absolute or otherwise, is challenged, is always whether the trustee acted in the state of mind contemplated by the trustor"].)  As with her pre-conservator transportation costs, Patty's or Earl's own food purchases, movie tickets, and the like did not "supplement" Daniel's public benefits—the SNT's stated purpose—unlike the items, services, and entertainment Patty purchased *for* Daniel.  Once Patty replaced the public guardian as Daniel's conservator, however, the county no longer provided Daniel with conservator services.  Accordingly, reasonable expenses Patty incurred in discharging the duties she owed Daniel as his court-appointed conservator—as with her

conservator fees discussed below—necessarily were for Daniel's welfare.[25]

e.  *Conservator fees*

The court found Patty's claimed conservator fees of $8,000 —billed at an hourly rate less than what Charlyne billed for her trustee fees—was "more than reasonable and should be allowed." The trust allows payment of trustee fees but is silent as to the payment of conservator fees. The court reasonably could conclude that was the case because the public guardian was Daniel's conservator when Roberta executed the restated trust, which included the SNT. As the public guardian remained Daniel's conservator, there would have been no reason for Roberta to amend her trust to add a provision specifically allowing for the payment of conservator fees. In any event, Patty's performance of her duties as Daniel's court-appointed conservator necessarily were required for Daniel's welfare. Accordingly, the court did not err in directing the trust to pay Patty's conservator fees.

**5.  *Attorney fees***

Finally, the court awarded Cohan his requested costs of $1,097.26 from the trust, finding he incurred them "while seeking relief that was to benefit Daniel [and] for which the trust should be obligated to pay." The court also found Cohan's "attorney fees

---

[25]  Patty notes section 2641 authorizes the court to include in an order of conservator fees compensation for a conservator's services "rendered before the date of the order appointing the . . . conservator." (§ 2641, subd. (b).) As we discussed, such compensation must be charged against the conservatee's estate, and the SNT is not part of Daniel's estate.

were generated in response to the litigation tactics of Charlyne and her counsel," including having to respond to Bunnett/Charlyne's opposition to releasing the funds for Daniel's dental work, responding to Bunnett's lengthy discovery requests, and apparently attending a six-hour deposition of Patty. The court, however, was "not persuaded" that all of the $36,925 in fees Cohan requested "went to benefit Daniel and/or the trust." The court found $27,850 was a reasonable amount of attorney fees the trust should pay Cohan.

The mental health court appointed Cohan as Patty's counsel under section 5370.1 of the Welfare and Institutions Code—part of the LPS Act—entitled "[a]ppointment of counsel for private conservator with insufficient funds." That section provides the court "may appoint . . . a private attorney to represent a private conservator *in all proceedings connected with the conservatorship*, if it appears that the conservator has insufficient funds to obtain the services of a private attorney." (Welf. & Inst. Code, § 5370.1, italics added.) We presume the court found Patty had insufficient funds to pay for counsel as it ordered the county was to pay attorney fees.

Cohan represented he was appointed to represent the conservator for all purposes—that would include representing Patty in the probate proceeding. The probate matter undisputedly was connected with the conservatorship matter. The mental health court ordered that the reasonableness of the dental treatment for Daniel, including its cost, should be determined by the probate court where the section 17200 petition was pending. Patty's efforts in the probate court to obtain the trust funds for Daniel's dental work were in performance of her duties as his conservator. Accordingly, it seems the mental

43

health court's order applies to Patty's attorney fees incurred in the probate court to secure the $30,000 disbursement for Daniel's dental treatment. In other words, as the mental health court ordered, the county should pay for that portion of Patty's attorney fees.

In a supplemental filing, Cohan stated he had not filed his fee request with the mental health court for his representation of Patty in the probate court because the presiding judge there told him those "services . . . related to counsel's appointment in the non-LPS probate case . . . and therefore the fee request should not be presented to the mental health court."[26] As Cohan's only court appointment comes from the mental health court's order, the terms of that order would seem to apply in the probate court as well. We remand the matter for the probate court to determine whether the county, in accordance with the mental health court order, should pay for that portion of Patty's attorney fees incurred in obtaining the funding for Daniel's dental treatment in the probate court.

However, we do not agree that the fees Cohan generated representing Patty in her petition for reimbursement of *her* costs and fees from the trust were for *Daniel's* benefit. Accordingly, we do not see a basis for the court ordering the trust to pay those fees.

Just as the trust is silent as to the payment of conservator fees, it also is silent as to the payment of attorney fees for anyone other than the trustee. Again, the public guardian was Daniel's conservator when Roberta executed the SNT and at her death.

---

[26] Cohan also said he had been paid for work he had done representing Patty in the mental health court.

The public guardian would not have been entitled to attorney fees from the SNT. Patty argues Article 5.4(c) "specifically provides . . . 'reasonable attorneys' fees' 'shall be a proper charge to the trust estate' in the event of litigation." That section, however, refers only to the *trustee's* attorney fees. The terms of the trust required the trustee to deny any request to release funds to pay for needs that public benefits would be authorized to provide, and to "take whatever administrative or judicial steps may be necessary to continue the eligibility of [Daniel] for all available public benefits." The paragraph ends, "Any expenses of the trustee in this regard, *including reasonable attorneys' fees*, shall be a proper charge to the estate." (Italics added.) It is disingenuous for Patty to imply this provision of the trust authorizes the conservator's attorney fees.

As there is no express provision authorizing payment of Daniel's conservator's attorney fees, we cannot find Charlyne's objection to payment of those attorney fees incurred to recover funds for Patty is an abuse of the trustee's discretion. Accordingly, on remand, the court should determine what portion of Cohan's attorney fees were incurred in prosecuting Patty's petition to recover her conservator fees, expenses, and attorney fees from the trust and exclude them.

6. ***There was no irregularity in the proceedings resulting in a miscarriage of justice***

Charlyne argues the irregularity in the proceedings caused a miscarriage of justice. Charlyne's chief complaint, as it was in her motion for new trial, is that the trial court abused its discretion in not conducting the bench trial in open court. Charlyne and her counsel appeared in person on the first day of the evidentiary hearing on October 20, 2021, but Patty, Cohan,

45

and the GAL appeared remotely through Court Connect. (Patty appeared by phone only.) Bunnett asked for a continuance, arguing his presentation of the evidence would be hampered as he had been prepared to question the witnesses using exhibits in an exhibit book. The court denied the continuance, noting the court allows parties to appear in person or remotely, depending on their comfort level with what then was an ongoing pandemic. Although the minute order setting the October 20, 2021 hearing date does not mention remote appearances, the court's order denying the new trial motion stated, "During the Court's trial setting conference, the Court authorized the parties to either appear remotely or in person for the upcoming trial."

Charlyne argues the court failed to give proper notice of the remote appearance under section 367.75 of the Code of Civil Procedure and rule 3.672 of the California Rules of Court. Even if we assume there was no notice, Charlyne has failed to show how she was prejudiced. The court began the hearing with Patty's petition. On a break, Bunnett was able to send his exhibits to the parties and counsel through a DropBox link, and they were able to open the exhibits and answer his questions about them. There was no miscarriage of justice.

Charlyne contends a miscarriage of justice occurred based on several other grounds, including that the court prejudged the evidence; attempted to coerce Bunnett to stipulate to Patty's claimed costs; did not allow Bunnett to develop a defense to Patty's and her counsel's accusations that Charlyne did nothing for Daniel's dental work; excluded exhibits Bunnett had prepared to reorganize and categorize the receipts Patty submitted; and there were purported inaccuracies in the statement of decision.

46

We find none of Charlyne's contentions has merit, nor has she demonstrated how any of them led to an unfair trial.

There is no evidence the court engaged in any misconduct. The parties submitted written argument and evidence in advance of the bench trial. The court did not prejudge the evidence. The court gave the parties its tentative ruling on some of the fees and costs claimed—after reviewing the parties' submissions—and noted it was inclined to grant Patty's request for reimbursement of about $33,200 but probably would "need some further testimony or elaboration" on the $56,500 she claimed in transportation costs. The court did not state it was inclined to exclude those expenses or ask Bunnett to stipulate to the $56,500 as Charlyne asserts. As to the $33,200 in costs, the court merely asked Bunnett if he wanted to submit on that figure. After Bunnett argued about certain items, the court noted it would be a "long slog" to go line-by-line, and the court would take that into account "in terms of any fees I make for anybody." We read the court's comments as trying to streamline the presentation of evidence and letting counsel know the court would not be inclined to find counsel's time reasonably spent for purposes of recovering fees if they were to go through each expenditure, line by line over several pages. In any event, neither Bunnett nor Cohan was awarded all the fees they requested.

As for the evidence, the court acted within its discretion to exclude Bunnett's duplicative exhibits of Patty's costs. (See Evid. Code, § 352.) And, based on our review of the record, Charlyne was able sufficiently to develop her case. Moreover, some of the evidence, or lack thereof, about which she complains is more relevant to the court's orders awarding her trustee fees

47

and attorney fees, which she does not challenge on this appeal. We find no prejudicial error.

### 7. *The court's sanction award*

In denying Charlyne's motion for new trial, the court awarded sanctions of $1,750 against Charlyne and her attorney, jointly and severally, to be paid out of her share of the trust directly to Cohan (for having to prepare his opposition). The court's September 2, 2022 minute order does not state the basis for the sanctions.

In his joint opposition to Charlyne's motions, Cohan invited the court to issue an order to show cause as to why Bunnett had not violated Code of Civil Procedure section 128.7 in filing his motions. Under section 128.7, subd. (c)(2), the court may, on its own motion, issue an order to show cause as to why an attorney should not be sanctioned for presenting a pleading or motion for an improper purpose, or without basis in law or fact. There is no such order to show cause in the appellate record. Accordingly, we presume the court did not issue sanctions under that statute.

Appellant's opening brief argues "[t]he fact the motion lacks merit is not enough by itself to justify an award of Code of Civil Procedure § 128.5 sanctions." (Respondent's brief provides no legal citation regarding sanctions.) Under Code of Civil Procedure section 128.5, a trial court may order a party and the party's attorney to pay "the reasonable expenses, including attorney's fees, incurred by another party as a result of actions or tactics, made in bad faith, that are frivolous or solely intended to cause unnecessary delay." (Code Civ. Proc., § 128.5, subd. (a).) " 'Frivolous' means totally and completely without merit or for the sole purpose of harassing an opposing party.' " (*Id.*, subd. (b)(2).)

48

At the hearing on Charlyne's motion, the court found the remote appearance issue discussed above was not "a meritorious basis" for bringing a motion for new trial under section 657 of the Code of Civil Procedure for a trial irregularity. Based on our discussion above, and the court's comments at the motion hearing and in its minute order, we conclude the court found the new trial motion frivolous. We agree. Nevertheless, to award sanctions under section 128.5, the court had to find the motion was frivolous *and* in bad faith. (See, e.g., *Shelton v. Rancho Mortgage & Investment Corp.* (2002) 94 Cal.App.4th 1337, 1346.) The court did not make such a finding. We thus reverse the sanctions order.

## DISPOSITION

The court's September 2, 2022 order awarding $1,750 in sanctions against appellant and her counsel is reversed. The court's June 24, 2022 "order re petition for allowance of conservator fees, reimbursement of costs advanced and incurred and conservator's attorney's fees and costs" is affirmed in part and reversed in part. The matter is remanded for the court to conduct further proceedings consistent with this opinion, as follows.

The court shall recalculate the amounts ordered to be reimbursed to Patty Wiedner from the SNT (1) to reduce the $32,198.36 reimbursement by (a) any cash deposits Patty made to Daniel's facilities for his PNI to the extent those amounts were covered by Daniel's monthly SSI payments that Patty received but did not pay to Daniel's facilities; (b) "auto allowance" (mileage) costs claimed for dates before April 10, 2019; (c) "auto allowance" (mileage) costs for dates on or after April 10, 2019, on which Patty also asked to be reimbursed for transportation

49

costs; (d) any out-of-pocket costs incurred before April 10, 2019 to pay for the meals or food, entertainment expenses, items, services, etc. of anyone other than Daniel Black; and (e) attorney fees (and any related costs) paid to Raxter Law in 2016 and 2017 and to Conover & Grebe in 2017; and (2) to reduce the $56,500 transportation costs reimbursement by the amount claimed for dates before April 10, 2019.  The $8,000 conservator fee reimbursement is affirmed.

With respect to the $28,947.26 in attorney fees and costs ordered to be reimbursed from the SNT to Patty's court-appointed attorney John Cohan:  (1) the court shall determine whether Los Angeles County should pay—under the terms of the mental health court's December 6, 2019 order—Patty's attorney fees incurred to obtain funding from the SNT for Daniel's dental work, and if so, order the County, rather than the SNT, to reimburse Cohan for those fees; and (2) if the court determines the County is not responsible to reimburse Cohan, the court shall reduce the $28,947.26 reimbursement from the SNT by the amount of attorney fees incurred to prosecute Patty's petition to recover her conservator fees, expenses, and attorney fees from the SNT.

The court also shall amend paragraph (2)(a) on page two of its July 1, 2022 order to direct the Trustee to pay the amounts as recalculated on remand.

The parties are to bear their own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EGERTON, J.

We concur:


LAVIN, Acting P. J.


ADAMS, J.


51